Morning everybody. Before we turn to the cases that are on the calendar for oral argument today, we have a motion that is to be made by one of the members of the panel, Judge Clevenger, and for that purpose I will turn the floor over to Judge Kelleher, who is a member of the Bar in good standing of the highest court of the Commonwealth of Massachusetts. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications for admission to the Bar. I might add that the basis for my sworn statement that I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications is based on the fact that she is serving at the current time with the utmost and highest distinction as my law clerk. It gives me deep and great pleasure to move her admission to the Bar, which if the motion is granted I'm certain that she will distinguish herself in the future as a member of our Bar. I'm going to recuse myself from voting on the motion because what I just said would probably suggest as it should to the audience that I'm biased. Mr. Clevenger, thank you. The panel has heard the motion and indeed considered the previously submitted papers in support of the motion. The court from time to time is faced with all kinds of motions, motions for extensions of time and motions for sanctions, and this is indeed a happy one. I can attest to Ms. Kelleher's qualifications for the Bar also because while each of us has our own clerks, we also benefit from the work of the clerks in other judges chambers because we confer on cases at all stages of the process. I can attest that in that regard Ms. Vanula has been of the benefit of knowing Vanula because we were next-door neighbors. I speak for my entire chambers by saying it's just been a pleasure and an honor to have had the benefit and value of her knowledge and talents through the past year. Thank you, Judge Prost. Ms. Kelleher, if you will step up and take the oath of admission. You saw the support for him that you would support yourself as an attorney and counsel for this court, not rightly and urgently at all, that you would support the Constitution of the United States of America. Thank you and welcome to the Bar of the Court. We look forward to seeing you in court from time to time. With that happy business accomplished, we'll turn to the cases before us this morning. I will just note for the record that we're having oral argument in four cases and in two cases there is no oral argument but rather the cases are being submitted on the briefs. I will just note those two cases for the record. The first one is number 06-3034, Hickok versus the United States Postal Service, and the second case is number 06-3115, Green versus the Merit Systems Protection Board. Again, those two cases are being submitted on the briefs. The first case in which we'll hear oral argument this morning is number 05-5007, Forest Products versus the United States. Is it Mr. Weigel or Mr. Weigel? Mr. Weigel? Okay, well, Mr. Weigel, I just wanted to confirm, you've reserved five minutes for your rebuttal? Yes. Is that correct? Okay, well, you can start whenever you're ready. Thank you. May it please the Court, my name is Ken Weigel. I'm a partner at Alston and Byrd. I'm here today on behalf of Forest Products Northwest. I replaced Andy Stewart in this case as counsel when Andy passed away unexpectedly after the briefs were filed. This case involves whether the Court of Claims has jurisdiction to hear a matter under the Tucker Act that relates to customs laws. The facts of the case, I believe, are relatively simple but somewhat unique. They involve customs' improper and overreaching decision that an article imported by Forest Products is within the scope of the anti-dumping and countermeasuring duty orders on softwood lumber from Canada. The issue presented by this case is where an importer must go to receive a timely decision on review of the customs decision. Specifically, the Commerce Department determined that edge glued lumber was excluded from the scope of the anti-dumping order in the investigation stage of the proceeding. Forest Products, a U.S. importer of lumber from Canada, took advantage of this exclusion of edge glued lumber by importing edge glued lumber and then cutting it into narrower widths. Customs did not like this practice. Customs disregarded DOC's instructions that excluded edge glued lumber and demanded that Forest Products pay anti-dumping and countermeasuring duties. These were paid by Forest Products under protest. Customs accepted the payment under protest and Forest Products sued for a refund in the Court of Claims under the Tucker Act. The Court of Claims decided that it lacked jurisdiction because there could be jurisdiction in the CIT. We respectfully disagree with that decision. To us, and I note to Mr. Stewart, this case is very analogous to TRACO, where this Court decided the Court of Claims has jurisdiction to decide Tucker Act claims involving certain customs issues. Aren't there some two significant differences though with TRACO, Mr. Weigel? One, TRACO I think involved a penalty. It involved a penalty. And two, TRACO was under the Little Tucker Act, came from the District Court, and had a different provision or didn't have the exclusive, the District Court's jurisdiction did not have the exclusivity provision that we have here. I believe, well first, I don't think it matters whether it's a penalty or another exaction of money or assessment of money by the government. I think it's the same issue. Also, I believe that the Little Tucker Act has the same exclusion in it for the CIT. It doesn't. It doesn't. It doesn't. No. But that was still, it was an issue in TRACO that was discussed in TRACO, was whether that Court has jurisdiction or the CIT has jurisdiction. Right, but in TRACO you had a U.S. District Court operating under the Little Tucker Act, and the Little Tucker Act doesn't contain the language that the Big Tucker Act does, which says that if the CIT has jurisdiction, the Court of Claims doesn't. I think that's, as the presiding judge pointed out, that's a distinguishing factor. It's true, is it not, that your client could have successfully mounted a claim in the process that would have led itself to the Court of National Trade with successful jurisdiction there. You could have sought a scope determination. Well, that's the problem here, and that's why this case is an issue. But the answer is yes, is it not. You could have sought a scope determination. Your Honor, it didn't need a scope determination. The question is could you have yes or no. Yes, you could. It could have applied to commerce for a scope determination. People do it all the time. Pardon me? People do it all the time. But in this instance, the difference is the scope was clear. The scope said, as this court in the Xerox case decided, the scope said in this instance that edge glued lumber is excluded. So there wasn't an issue at the Department of Commerce as to whether or not this product should be included. The problem arose because the Customs Service did not follow the directions of the Department of Commerce, which left the importer with no recourse. The importer either could have not paid the money and been sued, or as it elected in this case. Right, but what you're saying is Commerce has already decided that this particular lumber was excluded, right? Correct. And so it would have simply been a pro forma matter to go to Commerce and say, hey, Customs is giving us fits. Tell us that this stuff is excluded and that you'd be home free. I cannot, as I say, I did not have the case at the time. I cannot comment on that. In the amount of time, it would seem to me, maybe I'm wrong, but if it's true that there had already been a determination by the people who run the countervailing duty in the dumping world that your client's lumber was excluded and some feller in Customs is mad at you for one reason or another and decides to slap a number on you, and the time that it would appear to take to go to Commerce and say, tell them to cut it out, I mean, we are excluded, the case would have been resolved years ago. I mean, look at the passage of time that's gone by to try to make some new law to sort of slide an elephant through the keyhole on the basis of TRACA. I agree with the passage of time. However, in my experience, I don't know what happened here. I don't know. Because when Mr. Stewart passed away, his computer was stolen and a lot of records were gone. So I don't know what happened below or what happened at Commerce. But in my experience with dealing with Commerce, even when something is clear, it is not as simple as that. I have another instance that I'll deal with later today where I think something is as clear as that. And Commerce's response to me the other day was, send us a letter. We'll think about it. And the other alternative that would have led to CIT jurisdiction would have been to proceed to liquidation, right, and then protest the liquidation? That could have been done. However, these entries still haven't liquidated. This is part of the U.S.-Canada softwood lumber dispute that the newspapers tell us. That's a more time-consuming. Very time-consuming. Even if it were possible to move quickly on the avenue of scope at Commerce, that you're going to have your – the speed with which you can exhaust your remedy is determined by the government, not by you. Correct. And traditionally, these scope cases at Commerce have taken many years. I've been involved in them in 20 years of practice. I believe what an alternative could have been under this case, and if you look at the recent CIT decision in international custom products, is to have gone to the CIT under I. If we were to rule in your favor, sir, in favor of your client, would it not be appropriate to limit the holding of the case to a fact circumstance in which the product in question has been excluded from the scope by Commerce, excluded from the scope of the countervailing duty order? Yes, yes. I'm understanding you to say that if the government – the government may contest your allegation that this lumber has been excluded officially and is being clawed back into the duty world by a customs officer who is upset with the fact that they've recut it or for some other reason. Right. Yes. I didn't see that in your brief, but it would seem to me – I mean, you can appreciate the court's white knuckles, if you will, in opening the door of the court of federal claims to what would otherwise appear to be garden variety customs disputes arising out of countervailing duty orders. I can understand that, Your Honor. I mean, our friends downstairs would fall into apoplexy automatically, correct, at the notion that they're going to replace the Court of International Trade? It's not a replacement. It is a very unique set of facts, and it's really not an issue of trade laws, I see it. It's an issue of is a government officer fulfilling his or her duty under the law? What's wrong with Judge Block's take on the case, which is that you have an administrative remedy that you haven't exhausted and that the august judicial branch should hold its hand, if you will, refrain from acting until there has been an exhaustion of administrative remedies? The problem with that – and not until right around the same time as this case did this court overrule the CIT and instruct the CIT that it could review certain dumping issues under a protest, under A. So when this case was being set up, so to speak, that was new law from the court, because this court had to send a case back to the CIT and say – it's a case called Xerox – and say, yes, this anti-dumping issue can be challenged, because before that, anti-dumping issues could not be challenged in a protest. So that was one of the problems. Having said that, here we are three years later. The entries have not liquidated. So to the extent that that is an avenue of relief, it's not a meaningful avenue of relief, because as far as products – Well, isn't one of the administrative remedies the scope order? Again – I mean, there are two administrative remedies. That was the second one that the court mentioned. But again, Commerce, in this instance, told us what the scope was. And there's a long administrative record at Commerce about edge glued lumber in the investigation. Was there any precedence? Has this ever happened before, where on the facts of the case, as you amount them to us, Commerce, in its dumping, countervailing duty investigation, decided that your client's products are not covered. They're not within the scope of the order. And so consequently, they never should pay a dumping duty. All of a sudden, a dumping duty is imposed by somebody at the customs house who has quite a lot of power over your goods, because you're going to have to post a bond to get them in. Otherwise, they won't come, right? Right. And so this has never happened before? I'm sure it's happened before. The instance I'm most aware of is in Xerox, where this court told the Court of International Trade that, yes, there is jurisdiction under A in that situation. The problem we have is because, unlike Xerox, which was an old dumping case involving belts, where the liquidations would occur regularly every year, this case is Canadian lumber. And three or four years later, we still don't have any liquidations. So there potentially could be jurisdiction under A. What happened to the lumbers? The lumbers entered the stream of commerce and gone someplace, right? It's just a question of whether, after the fact, your client is going to be able to claw back a duty they paid. Right. And it also involves the issue of past entries that customs is now going after. Mr. Weigel, thank you. You're about halfway or so into your five-minute rebuttal, but we'll give you your full five minutes if you decide you need it. Thank you. Thank you. We'll hear from the Governor's Davidson. May it please the Court. It's well established that when Congress enacts a detailed statutory scheme for certain claims against the government and designates a particular court for judicial review of those claims, that other courts are implicitly ousted of jurisdiction. And this court has so held with respect to Medicare claims, civil service claims, forfeiture claims. This case, however, is particularly clear because Congress has expressly provided in two different statutes that the Court of Federal Claims may not invoke its Tucker Act jurisdiction in order to supplant, to replace the court that Congress did designate to hear this type of claim. And therefore, the Court of Federal Claims properly dismissed this case for lack of jurisdiction. Do you agree that the little Tucker Act doesn't contain the same exclusionary language? The little Tucker, correct. I agree. However, it doesn't make a difference from our perspective. If there were no statute that expressly ousted the Court of Federal Claims from hearing this type of case, we would contend correctly in our view that Congress has been very clear in giving the Court of International Trade exclusive jurisdiction for this type of case. And the Supreme Court in Kmart made clear that when Congress used the term exclusive in 28 U.S.C. Section 1581, it meant exclusive and no other court can hear the claim if it belongs in the Court of International Trade. However, it is- Is Mr. Weigel correct when he describes the products in suit as products that were excluded from the scope of the anti-dumping order? No, he is not. He has left out a key phrase in the anti-dumping and countervailing duty orders. Forest Products likes to refer to the language edged wood lumber as being excluded, but the actual language is edged wood lumber that is properly classified under a particular tariff classification. So the Customs Service determined after visiting Forest Products facilities and conducted an investigation that its products, what it called its edged wood, was not properly classified under that specific tariff classification. Is that because of the sizing of the cutting? Or what was the ground on which the Customs determined that this was not edged wood within that particular tariff classification? There were several grounds. One was that the product was not finished in a way that edged wood is normally finished when it's imported under that category. Another was that the use of the product after it was brought into the United States, that as soon as- I guess it was glued together and then as soon as it was brought into the United States, it was taken apart and sold for uses of products that were covered by the order. And Customs, relying on age-old case law, said, well, you can't do that. That's an artifice. You can change a product and thereby change its classification and even avoid an anti-dumping or countervailing duty order, but you have to change it into a legitimate product and keep it as that product. You can't change it temporarily until you get through Customs and then switch it back to a product that is under the order. And Customs determined that the product that Forest Products was bringing in wasn't even really a product that was recognized in the industry. I would like to respond to Mr. Weigel. Assuming that there was no statutory provision that allowed for a scope determination at Commerce once a countervailing duty order has been issued, I understand what that provision is there for, but just assume that didn't exist. Then if Forest Products wanted to play the game the way you want them to, they would have to await liquidation, would they not? That's correct. And that could be a matter of what's the maximum amount of time before you have a deemed liquidation? Do you have deemed liquidation in these settings? Actually, we think that the deemed liquidation will occur next month, the end of June, because these particular entries were part of the second administrative review by Commerce under the lumber anti-dumping and countervailing duty orders. The final results in that review were issued in December, and the case is now before a NAFTA panel. However, NAFTA panels, unlike the Court of International Trade, do not have injunctive power, so they can't suspend the entries. So in the government's view, under this Court's decision in international trading, those entries will be deemed liquidated six months after the final results were issued, which would be this June. Now, that is a matter that's very hotly disputed. You're not prepared to make a concession? No. I'm looking for a way, if I can, to find an answer to this problem before too many more years go by. Well, what I'm saying is that the case is advanced. Commerce has finished its administrative review of the group that includes these entries. There's a NAFTA proceeding pending to review those results, and in the government's view, liquidation will be deemed as of June. The Canadian importers take a different view, and they think that liquidation will not occur until the NAFTA panel has finished its proceedings. But we're on the way there, and, of course, there's no appeal from a NAFTA panel. Well, I would think that if forest products were not successful in front of this Court, then the earliest date they could find a deemed liquidation would be beneficial to them. I would think so. Otherwise, it's sort of a lawyer's relief act case for a long time. I do want to note, though, that our interpretation of the six-month deemed liquidation rule before NAFTA panels is hotly disputed by Canadians, and that is an issue pending before the Court of International Trade. This is a garden variety. It's certainly not a unique situation. There are numerous importers that contest the application of anti-dumping and countervailing duty orders to their specific products, and they have two ways that they can approach that. They can ask the Commerce Department for a scope ruling, and there are very short time limits for making a scope ruling. I believe it's within 45 days, but it's not years and years, as Mr. Weigel said. By statute, it's much shorter than that. In this case, because the order cross-references customs classification authority, refers to entries that are properly classified by customs, another route would be to deposit the duties, and of course they're just deposits that get them back with interest if it turns out that they're not owed, and then protest when the entries are liquidated to file a protest and take their case to the Court of International Trade. Customs classification cases have been heard by the Court of International Trade and its predecessors since the founding of this country. And typically are heard years after the goods have entered the stream of commerce and disappeared, right? Yes, yes. That's just the way it works. They post the bond, the goods come in, the lumber goes into a house, the house burns down, the goods are gone. Many years. It's gotten much faster, though, over the years. Now, TRACO is distinguishable. Well, that's what all the deemed liquidation statutes did to force the issue quicker so people would not be hung up until the cows come home. Exactly. Now, TRACO is distinguishable for another reason, though, other than the ones we've mentioned before, and that is that in TRACO, the plaintiff had exhausted all of its administrative remedies. It had done everything it could under the customs procedures for contesting a civil fraud claim, and there was a final assessment against it issued by the Customs Service, and the government had not taken action to enforce that in a court. Therefore, there was nothing left that the plaintiff could do before the agency, but there had been a final administrative assessment of fraud, and this court emphasized in its decision that there was no remedy in the Court of International Trade for a plaintiff in that situation, that the Court of International Trade's jurisdiction was limited to actions by the government to enforce the customs final assessment of fraud, and therefore, the rule that the CIT had, excuse me, the Court of International Trade has exclusive jurisdiction for any matter within its jurisdiction didn't apply in TRACO because it didn't have jurisdiction over that kind of claim. But in this case, the Court of International Trade clearly has jurisdiction under two different provisions. What the plaintiffs have done is to try to create a third that doesn't exist in the law. The only other point I guess I'd make, although I do have time, is that Mr. Weigel mentioned two cases this morning that were not cited in the briefs, international customs products and Xerox. If the court thinks that those are important, I'd request leave to submit something supplemental on those cases. I trust your presence here today, Ms. Davidson, reflects the department's concern about the possible significance of this case. Absolutely. And perhaps also the creativity of the theory advanced by Mr. Stewart on behalf of his client. That's true. The other case that Forest Products relies upon is a Court of Federal Claims case, High Toys. And I would like to mention that that case is distinguishable because it was a forfeiture case. Also, we strongly disagreed that the Court of Federal Claims had jurisdiction in that case, but we prevailed on the merits, so we were unable to appeal. And I believe that this court's decision since that time may have implicitly overruled it, because this court has since that time held that forfeitures clearly belong in the district courts and cannot be brought into the Court of Federal Claims under the Tucker Act. And in any event, it's not a decision that's controlling on this court. So for those reasons, as well as those set forth in our brief, we respectfully ask that you abide by the judgment below. Thank you, Ms. Davidson. Mr. Weigel, as I said, you have your full five minutes if you need it. Thank you. I will try to use less than five. Just responding to the questions, first on the liquidation date, I think it's important. There are two cases, a countervailing duty case and an anti-dumping case. And even if the anti-dumping case is resolved, the government of Canada is challenging all of these entries in the countervailing duty case. So it's like I heard once someone from Customs say it's like trying to take the New York subway to Boston in some of these anti-dumping cases to finally get liquidations. I have literally had liquidations in the 90s of entries in the 70s that obviously were a problem within Customs, but it can literally take 10, 20 years. Second, on the edge-glued lumber, if you look at the Commerce Department decision, like every other one it says, although the HTS U.S. subheadings are provided for convenience and U.S. Customs purposes, the written description of the merchandise subject to this order is dispositive. So at most, the reference to 4421 meant what was classified in heading 4421 when Commerce wrote the decision. Customs has a ministerial duty here. It only implements what Commerce tells it to do. It does not have the discretion to reclassify merchandise and bring it in or take it out of the scope of an anti-dumping or countervailing duty order, which is what the government is suggesting. What would happen if some lumber was brought into the United States from Canada that just clearly did not fit within the classification that was referenced in the exclusion order? I mean, let's say the exclusion order says that what's excluded is a white oak of a certain something or other, okay? And all of a sudden, Forest Products brings in a truckload of redwood trees. And they say, pay the duty on redwood trees because this is not white oak. Customs clearly has that authority. Yes, yes, clearly has that authority. In that case, it's up to an importer to declare whether or not. There's a difference between that and Forest Products brings a truckload of wood in, and they say this is excluded wood. This has all the qualifications of HTSUS 9.3.404C12AB, right? Right. And the customs officer pulls that thing out and looks at it, and he goes over and looks at the truck, and he says, no, you've got too many knots in this wood. You don't qualify. Why is it that the customs doesn't have that authority to make a determination as to whether the goods coming across the border actually meet the test of the classification? They do have that authority. What we're saying here is what was imported was permanently edge-glued lumber. It was professionally glued, and it was very expensive. The only reason this practice worked was because Forest Products was dealing with western red cedar, which they were paying about $2,000 per hundred square feet for, and therefore this worked. If this was run-of-the-mill pine spruce fir, softwood lumber, this wouldn't have worked. It would have been too expensive to create this product in Canada to import outside the scope. My third point is there is no statutory scheme here in scope areas, and it has. No statutory scheme because of the peculiar characteristics of this case? Not just the characteristics of this case. Congress really hasn't addressed the scope issue as clearly as perhaps it could have. Come on. You're over-arguing your point. Congress has set up a scheme to deal with part of the system. With dumping. They've set up a system to deal with countervailing duty and dumping problems. It knew exactly what involves commerce and the rest, and then there's a court up in New York that got created and got vested with jurisdiction to deal with all of this. But there is no time limits on commerce to act on a scope issue. I've had scope issues personally, in other cases, drag on for many years of commerce. I suppose you could mandamus commerce if they sat on something for 25 years, right? Yes. But as Ms. Davidson said, it's pretty clear that the judges of the court of federal claims would be shocked if they were told that they had sort of general jurisdiction over dumping cases if somebody wants to come down there, short-circuit the CIT process, right? I agree with that, and that's why. In order to prevail, don't you have to throw yourself on your knees in front of us and say this is a case that is so odd on its facts? And it is, Your Honor. That's what we're saying. But that's what I was trying to say. I didn't think it was odd on the facts. I thought you agreed with me that there's nothing wrong with Charlie Customs at the Canadian border stopping your truck with the wood on it, crawling up on top, holding his custom classification in one hand and his magnifying glass in the other. And if he disagrees with you, then you're going to have what's called a customs classification chicken fight, right? I don't believe it's a customs classification fight because it's not a classification issue. It's an issue of what did the Commerce Department say? Why isn't it a classification issue? Because Customs… Commerce chose to say, Commerce chose and said sort of, I'm getting it now, Commerce sort of chose itself to go hand in glove with the Customs Department because instead of Commerce defining itself what the characteristics of these clues of goods are, they said look in the Harmonized Tariff Schedule at this particular provision, and that's what's being excluded. No, no. Your Honor, what Commerce typically does in a scope decision is it lists tariff provisions, but it lists those for the convenience of Customs. And it's clear and the courts have said it's clear in other scope cases that it's the language of the Commerce decision that is what's important. My last point is if we don't have jurisdiction at the Court of Claims, I believe based on some recent cases and obviously a 2005 case, I believe that was cited after the briefs, international customs products would seem to indicate to me that forest products maybe should be in the Court of International Trade under I. Thank you.  The case is submitted.